# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JILRIALE LYLE,                    )
                                  )
        Plaintiff,        )
                                  )
    v.                          )     **No. 3:09-0333**
                                  )     **Judge Echols**
THE CATO CORPORATION,             )
                                  )
        Defendant.        )

## MEMORANDUM

In this employment discrimination action, Defendant, The Cato Corporation ("Cato"), has filed a Motion for Summary Judgment (Docket Entry No. 17), to which Plaintiff Jilriale Lyle has filed a Response and Memorandum in opposition (Docket Entry Nos. 23 & 24), and Defendant has filed a Reply (Docket Entry No. 27).

## FACTUAL BACKGROUND

Together, the parties present 180 separate statements of facts which are allegedly undisputed. To place those facts in some sort of order, the Court first sets forth the facts, in roughly chronological order, which relate to Plaintiff's employment and performance while an employee of Defendant, and then sets forth the facts which relate to racially discriminatory comments which were allegedly made to Plaintiff.

### A.  Allegations Relating to Plaintiff's Employment and Performance

Defendant is a retailer of women's fashions and accessories.  On November 30, 2007, Plaintiff, an African American female, began working for Defendant as a Second Assistant Manager at its store in Murfreesboro, Tennessee.  She transferred from that store and became the First

1

Assistant Manager of the Cato store in Antioch, Tennessee on May 18, 2008. As the First Assistant Manager, Plaintiff was an hourly employee with no authority to hire, fire, or discipline other employees.

At all relevant times, the employees in the Antioch store included the Store Manager, Lori Manna ("Manna"), Plaintiff, the Second Assistant Manager, Renee Anderson ("Anderson"), and between three and five part-time sales associates. Typically, two employees worked in the store at a time – one part-time sales associate and either the Store Manager, the First Assistant Manager, or the Second Assistant Manager. The District Manager for the Antioch store was Desiree Hillis ("Hillis").

After being hired by Defendant, Plaintiff received a 30-day, 60-day, and 90-day performance review. Those reviews were mixed.

- On her 30-day review, Plaintiff was rated as "needs improvement" in the categories of "Supervisory Attitude" and "Work Attitude," but was also given an "acceptable" mark in policies and procedure, communication skills, customer service and sales productivity, and was noted as being "great with customers" by her manager.

- Plaintiff's 60-day review noted that Plaintiff "still needs to understand adage, 'on her watch, her responsibility,'" but also indicated that she had improved and been upgraded to "acceptable" in the categories of "Supervisory Attitude" and "Work Attitude."

- Plaintiff's 90-day review noted that Plaintiff's "supervisory attitude still needs a lot of improvement," but in her review her manager also wrote that "I believe you can do it with better direction," "Still great customer service," and "Asks for credit - Good job." The manager also noted that Plaintiff was a "great second assistant," who "takes direction well," and was "doing great with what she had been taught" despite the need for more training.

After each review, Plaintiff was recommended for continued employment.

At some point in October 2008 (the record is unclear as to the precise date), Christie England ("England"), an associate who worked at another Cato store, was asked to help out at the Antioch store. She was supposed to arrive at 3:00 p.m., but was late due to traffic. England claims that, upon her arrival, Plaintiff threw the store keys at her, said "I'm late for class," and "stormed" out of the store. Plaintiff denies throwing the store keys at England, and claims she merely told England that she was going to be late for class because of England's late arrival. In any event, England complained to Manna who wrote a memorandum about the incident and Manna spoke with Plaintiff about her attitude. While Plaintiff admits she spoke with Manna about the incident, she claims Manna said it was "no big deal" and that Manna said it did "not make sense" that Plaintiff had thrown the keys at England.

In October, 2008, a customer came into the store with her three sisters. Manna summarized the discussions she allegedly had with the customer as follows:

> On Tuesday while up front a customer looked at me and said, "Is this a new crew in this store?" When I told her we had all been here for several months, she gave me a strange look. She then proceeded to inform me that she has not been in our Cato store for several months due to a rude & disrespectful associate. I asked her to please tell me what happened and she just said the last time that she and her sister and friends were in the store they were not treated very well at all. She described Plaintiff and said she will never shop in this store when she is in here. She is a religious Cato shopper and said she and her sister would shop in here every 2 weeks to check out the new merchandise and see what is on clearance. She said if I got a hold of the old manager she would back her up on this. She would spend about $70.00 herself when she would come in.

(Manna Depo. Ex. 4). Manna asked the customer and her sisters for their names, but they refused to give the same, saying that they did not want to get involved. Manna claims that she gave Plaintiff a verbal warning about the incident. Plaintiff denies that she was given a verbal warning, believes

3

the customers do not even exist, and that Manna made up the incident in retaliation for Plaintiff complaining about racial comments made by Manna.

In January 2009, Manna received a call at home from Ola Reynolds ("Reynolds"), a sales associate, who was working at the store with Plaintiff. Manna claims Reynolds complained about Plaintiff's attitude and stated that because of the attitude she intended to quit. The following day, Manna discussed the incident with Plaintiff, but claims Plaintiff "kept talking about the sales aspect and not the underlying issue which was the screaming at each other the prior day." (Manna Depo. Ex. 8). Plaintiff claims that Reynolds was complaining about not wanting to vacuum the store and that Manna told Plaintiff to "deal with her" and "not to take her complaints seriously" because Reynolds was not going to be there long due to "mental problems."

On January 12, 2009, Plaintiff received an Associate Consultation Notice which indicated that Plaintiff was being counseled for the October customer complaint, and for complaints by associates for which Plaintiff allegedly received verbal warnings on October 11, and 16, 2008. In the Notice, Manna wrote, "As you have stated you are my 1st Assistant. I do not need complaints on you. This is also about not following directions." (Manna Depo. Ex. 3).

Plaintiff admits she received the Associate Consultation Notice, but claims she was never verbally warned about any of these incidents. After receiving the January 12, 2009 Consultation Notice, Plaintiff contacted Hillis and told her that she did not have an attitude problem with any customers or co-workers, and also stated that Manna had never before mentioned to Plaintiff that her attitude with customers or coworkers had been a problem. Plaintiff told Hillis that she was upset because Manna was making up verbal warnings that did not occur.

4

Hillis then questioned Manna about the customer and associate complaints, but did not tell Manna that she had spoken with Plaintiff about the Associate Consultation Notice. After speaking with Manna, Hillis believed the Associate Consultation Notice was accurate and instructed Manna to prepare a "Letter of Going Forward" which explained that, from that date forward, conversations between Manna and Plaintiff concerning any issues and tasks would be written down and signed by both Plaintiff and Manna so that there could be a clear understanding of expectations and instructions. Hillis believed this process would be the best way to ensure clarity and avoid confusion concerning instructions.

Manna prepared a "Letter of Going Forward" on January 13, 2009 and presented it to Plaintiff for signature on January 14, 2009. Plaintiff refused to sign the letter.

On January 13, 2009, one of the store's regular customers told Manna that she would not shop in the store any more when Plaintiff was working because Plaintiff was rude to her while handling a return. Plaintiff received an Associate Consultation Notice on January 14, 2009 in relation to this matter, but Plaintiff was not disciplined as a result of the alleged complaint. Manna wrote in the Consultation Notice that Plaintiff had informed her that she had contacted the Equal Employment Opportunity Commission ("EEOC"). Manna forwarded a copy of the Consultation Notice to corporate human resources and informed Hillis that Plaintiff "was going to the EEOC." (Manna Depo. at 23). Plaintiff believes that this was another fabricated complaint by Manna, and Plaintiff told Manna she had contacted the Equal Employment Opportunity Commission, even though she had not.

Plaintiff was absent from work on February 13, 2009, February 17, 2009, and March 13, 2009. Plaintiff provided a doctor's note to excuse her absence on February 13, 2009. She later

5

brought in a second doctor's note to excuse her from work between February 13, 2009 and February 18, 2009.

Plaintiff was scheduled to open the store by herself on March 13, 2009. After arriving late to work that day, Plaintiff called Manna and Hillis and said she was leaving because she was not feeling well. That same day, Plaintiff was demoted by Hillis from First Assistant Manager to sales associate. Defendant claims that this was due to excessive absenteeism,[1] but Plaintiff claims it was in retaliation for her complaints about racial comments by Manna.

Upon Manna's arrival at work on March 13, 2009, Manna informed Plaintiff that she had been demoted to sales associate. Plaintiff claims Manna also told her she "could quit or get in the unemployment [line] like the rest of the black population." (Pf. Depo. at 119).

On March 18, 2009, the next day Plaintiff was scheduled to work following her demotion, Heather Christian ("Christian") began her first day as First Assistant Manager at the Antioch store. Christian had not worked with Plaintiff before, and she did not know Plaintiff had previously been the First Assistant Manager.

Within approximately the first thirty minutes of the start of Plaintiff's shift, a confrontation occurred between Plaintiff and Christian. Christian called Manna to notify her that Plaintiff had called the police and that they were on their way to the store. Manna went to the store and found the police already there.

---

[1]Defendant has an attendance/tardiness policy which prohibits excessive absenteeism which is defined as "two or more occurrences" (excused or unexcused) "within one month." A violation of Defendant's absenteeism policy "will result in disciplinary action, which could include termination." (Warsinsky Depo. Ex. 3).

6

According to a police report,[2] Plaintiff told the officers that Christian "assaulted her by pushing her in the chest" because "she was not being compliant with [Christian's] orders" and Christian claimed that Plaintiff "got into her face when [Christian] asked her to get to work," "got irate in front of the customers," and "got into her face causing [Christian] to back up and trip over some boxes causing her to fall into the door." Plaintiff asked the police to call an ambulance to transport her to the hospital.

The incident was investigated by John Warsinsky, the Manager of Associate Relations for Defendant. During his investigation, Warsinsky obtained statements from Christian and Plaintiff concerning what happened during the incident, as well as from Manna concerning what happened after Manna arrived at the store. He also spoke with Hillis, the District Manager, on the day of the incident.

In Christian's statement, which Warsinsky received either the night of the incident or the next day, Christian wrote:

> I had never met [Plaintiff] before so I didn't know who she was or what she looked like when she came into the store. When she came in I was very nice to her and greeted her as soon as she walked in. She didn't respond, just walked straight back into the back room. I could tell as soon as she walked in she had an attitude . . . she came up to me with an attitude and rudely said to me, "what do you want me to do?" I replied, we have some shipment left that needs to be put out on the floor if you wouldn't mind working on it. She immediately disrespected me and started talking back and said I am just a sales associate I do not know what to do. You are going to have to tell me . . . she started hollering across the store, 'You aren't my manager!" I immediately came behind the register and politely told her I needed to speak to her in the back room because their [sic] were customer [sic] in the store and she was embarrassing the company. We went into the back room and she kicked the

---

[2]Plaintiff objects to consideration of the police report and several other documents (such as Manna's notes) referenced by Defendant in its Statement of Undisputed Facts on the ground that the same are hearsay. However, this report and the other documents are not being considered for the truth of the matter asserted, but rather to show that the statements or notations were made.

> stopper out of the door that kept the door propped open and the door shut. She
> immediately got into my face and was yelling at me. "You are not my boss; I am not
> listening to you!" The only thing I said to her was that she was not going to
> disrespect me or anyone at Cato's. She was in my face nose to nose. I backed up
> away from her and fell back on the trash and boxes from shipment and fell on the
> back door and the back door alarm started to go off. [Plaintiff] ran out of the back
> room onto the floor and yelled across the store that I pushed her. She said to the
> customers "she pushed me, didn't you see her push me?" All of the customers just
> looked at her like she was crazy and was [sic] shaking their head[s] no.

(Warsinsky Depo. Ex. 7). After receiving this statement and speaking with both Manna and Hillis,

Warsinsky decided that Plaintiff should not return to work until after he had time to investigate

further. Manna was not aware of the suspension decision until after it had been made, and she was

not involved in the decision. Further, at the time of the decision, Warsinsky had not received a

statement from Plaintiff.

Warsinsky and Plaintiff exchanged phone messages between March 19 and 24, 2009, before

finally speaking by phone on March 24, 2009. Warsinsky did not feel that Plaintiff was directly

answering his questions and so he asked her to collect her thoughts and provide him with a written

statement detailing what had occurred. On March 25, 2009, Plaintiff sent Warsinsky an e-mail

which, in relevant part, read:

> On that particular day I came to work at 2:00 p.m. After I had been at work for a
> while and finished the go-backs, I asked Heather what was in the agenda next. She
> then got upset and told me to get in the back room. Once I was in the back room, she
> used profanity, pushed me then I hit my head and neck on the emergency exit. I
> called the police then the ambulance came and I went to the hospital.
>
> I don't feel that it is fair that I was suspended, yet Heather wasn't. I've already been
> demoted and my hours have been cut. I feel that all this has happened to me because
> I have complained to Desiree Hillis about Lori's racist comments. I feel that
> Desiree should've helped me fix this problem, yet she wouldn't return my calls after
> Lori started to falsify documentation about me. I have been suspended for no reason
> and I [have] no source of income. I have bills that need to be paid. And I have no
> choice but to look for other employment unless Cato returns me back to work like

8

I should have been. If I can't go back to work immediately, then I should be paid for the time I'm off.

(Pf. Depo. Ex. 20). Plaintiff did not mention the alleged racist comments in her phone call with Warsinsky on March 24, 2009, nor did she mention such comments in any of the voice mails she left for Warsinsky.

On March 26, 2009, Warsinsky asked Hillis if Plaintiff had complained to her about Manna making racist comments. Hillis denied that Plaintiff ever made such a complaint. That same day, Warsinsky sent Plaintiff an email asking her for more detailed information about the March 18, 2009, incident so that he could complete his investigation. He also asked Plaintiff for more information about her allegations that Manna had made "racist comments" and had "falsified documentation," and also about the complaint Plaintiff said she made to Hillis. Plaintiff did not answer any of these questions. Warsinsky sent Plaintiff emails again on March 30, 2009, and on April 3, 2009, asking Plaintiff to answer his previous questions. Plaintiff never answered the questions.

Warsinsky consulted with Robert Brummer, Defendant's Senior Vice President of Human Resources, and the two determined that Plaintiff should be terminated as a result of her unprofessional conduct on March 18, 2009. Manna was not involved in either the decision to suspend Plaintiff's employment pending the investigation or the decision to terminate Plaintiff's employment, and Manna did not know the decisions had been made until after the fact.

**B.  Allegations Relating to Racial Comments**

Plaintiff claims that during her employment at the Antioch store, she was repeatedly subjected to listening to Manna make racist and/or offensive statements in relation to African Americans. These statements occurred "so often" and at least several times a week. (Pf. Depo. at

9

174 & 250).  In her deposition, Plaintiff recalled the following statements and comments allegedly made by Manna:.

• Sometime around April 2008, after Plaintiff told Manna that her parents were going to have to pay taxes, Manna responded by saying she found it "surprising" that Plaintiff's parents were successful and that "[m]ost black people get taxes back instead of paying taxes." (Pf. Depo. at 165-66).

• During the 2008 presidential election, Manna stated, "I don't know why you are going to vote for him . . . he's not even really black." (Id. at 170-71).  Once President Obama was elected, Manna stated "the crime rate is going to go up because a lot of black people think he's going to get them off," and that, during this same conversation, Manna "said something about how I guess – I guess you're happy there's going to be a change."  (Id. at 169-171).

• In October 2008, Plaintiff witnessed a black male and black female customer steal merchandise from the store, after which Manna commented "that's why I don't trust black people or blacks." (Id. 179).

• In December 2008, Manna stated in a joking manner that "she didn't like putting two black people on the schedule because they have a tendency to get lazy." (Id. at 173).

• Also in December 2008, Manna came into the store with a Starbucks cup of coffee and when Plaintiff asked her why she did not bring her a cup, Manna replied, "I didn't know black girls liked Starbucks."  (Id. at 173).  Manna made a similar comment around Christmastime when Reynolds was given a gift certificate to Starbucks by Manna, but Plaintiff was given a bag of homemade nuts as a gift.  (Id. at 181-82).

• Still in December 2008, Manna stated to Plaintiff that Shardae, an African American associate, was "the epitome of ghetto." (Id. at 177).

• Sometime in February 2009, while Plaintiff was eating chicken in the back room of the store during a lunch break, Manna either said, "you love your fried chicken" or "you blacks love your fried chicken." (Id. at 191-192).

• On a few occasions in January and February, 2009, Manna told Plaintiff that Plaintiff  "didn't sound like the typical black girl" because she "pronounced all her syllables" and "talked like [she] got sense." (Id. at 194-95).

• In January 2009, Manna told Plaintiff to "watch" two black female customers who came in the store, telling her that "this town is full of lazy asses and thieves" and on

10

some other occasion said that "blacks have a tendency to steal." (Id. at 182, 183 & 189).

According to Plaintiff, in November 2008 she called Hillis and told her that "Ms. Manna told me that she wanted to hire more whites because blacks scare off the customers." (Pf. Depo. at 197-198). Plaintiff claims that Hillis cut her off, and told Plaintiff she was taking the comment the wrong way. Plaintiff also claims Hillis said she would call her back because she was busy, but never did.

After the November 2008, telephone call, Plaintiff claims she attempted to complain about Manna several times over the phone to Hillis, but Hillis would cut her off every time she raised the issue of alleged racial statements. Plaintiff asserts the most she ever got out before getting cut off during each of these calls is that Manna "was still making these racist comments." Plaintiff did not contact anyone else at Cato and inform them about Manna's alleged statements.

Aside from Plaintiff, no employee in the Antioch store complained to Hillis or anyone in the corporate office about allegations of discrimination or harassment during their employment, even though these employees received Defendant's policies prohibiting discrimination and harassment during their employment.

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v.

11

Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  APPLICATION OF LAW

In her Amended Complaint, Plaintiff brings claims for racial harassment/hostile work environment and for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* 42 U.S.C. § 1981 and the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.*  Plaintiff claims that she was subjected to a racially hostile work environment through "racial comments" allegedly made by Manna. Plaintiff also complains that she was retaliated against for complaining to Hillis about the alleged racial comments. The same basic analytical framework is used in evaluating Plaintiff's claims under the three statutes. See, Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004)("[t]he elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981)"; Gee-Thomas

12

v. Cingular Wireless, 324 F.Supp.2d 875, 881 (M.D. Tenn. 2004)("analysis of claims under the THRA is the same as under Title VII").

## A. **Hostile Work Environment**

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). "In order to establish a hostile work environment claim, an employee must show the following: 1) the employee is a member of a protected class, 2) the employee was subject to unwelcome harassment, 3) the harassment was based on the employee's race, 4) the harassment affected a term, condition, or privilege of employment and 5) the employer failed to take reasonable care to prevent and correct any harassing behavior." Moore v. KUKA Welding Systems, 171 F.3d 1073, 1078-79 (6th Cir. 1999). "The phrase 'terms, conditions, or privileges of employment'. . . includes requiring people to work in a discriminatorily hostile or abusive environment." Harris, 510 U.S. at 17. Liability may be imposed where a supervisor engages in workplace harassment which leads to a tangible employment action, or where the employer fails to exercise reasonable care to prevent and correct known harassment by a co-worker. See, Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275 (1998); Burlington Industries Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998).

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the

conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Appropriate factors for the court to consider when determining whether conduct is severe or persuasive enough to constitute a hostile work environment 'include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. quoting Harris, 510 U.S. at 23.

In this case, Defendant's sole argument in regard to Plaintiff's hostile work environment claims is that, when viewed in light of the totality of the circumstances, Plaintiff cannot show the allegedly harassing conduct was so pervasive or severe as to alter the conditions of her employment. On this score, Defendant argues that the statements allegedly uttered by Manna did not involve racial slurs (but were rather offhand comments which may have been insensitive), and further that some of the statements were directed at others, not Plaintiff. (Docket Entry No. 18 at 13-15). Defendant also cites several unpublished decisions of the Sixth Circuit wherein that court found that the facts presented did not amount to severe and pervasive harassment.

Obviously, each case turns on the specific facts presented and this Court is to look at the totality of the circumstances in determining if sufficient evidence exists to warrant a trial on whether the alleged conduct constitutes harassment. The Court is not to disaggregate the incidents by "divid[ing] and categoriz[ing]" them because to do so "divorc[es] them from their context and depriv[es] them of their full force." Williams, supra 187 F.3d at 562. This is because "when the complaints are broken into their theoretical component parts, each claim is more easily dismissed." Id. Instead, "the totality-of-circumstances test must be construed to mean that even where individual

14

instances of [racial] harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." Id. at 563.

"[M]indful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility," id., this Court concludes that a factfinder[3] could determine Plaintiff was subjected to a hostile work environment or, at the very least, Plaintiff's allegations raise questions of fact. After all, the workplace Plaintiff describes was replete with offensive and pejorative comments about African Americans made by Plaintiff's supervisor, comments which allegedly occurred several times a week.

Separately, each comment might not be considered to be severe and pervasive since none was threatening and some were directed to others. However, when combined it is clear that sufficient facts have been forwarded which could support a determination that Plaintiff was subjected to a hostile work environment. See, Bakersville, supra, 50 F.3d at 431 (there is no bright line "between a merely unpleasant working environment . . . and a hostile or deeply repugnant one...; and when it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error").

**B.  Retaliation**

In her Amended Complaint, Plaintiff claims retaliation because she received the Associate Consultation Notices in January 2009, she was demoted on March 13, 2009, and she was suspended pending an investigation in relation to the March 18, 2009 incident. In her opposition to the Motion for Summary Judgment, she also claims that her termination was in retaliation for the complaints she made about Manna.

---

[3]This case is set for a bench trial and therefore the factfinder will be the Court, not a jury.

15

In the absence of direct evidence, retaliation claims are reviewed under the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) framework.  <u>Harris v. Metro. Govt. of Nashville</u>, 594 F.3d 476, 485 (6th Cir. 2010).   "To make a prima facie showing of retaliation, plaintiff must show that (1) [s]he engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subjected to materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action.  <u>Id</u>.  "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met."  <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate non-discriminatory reason for its action.  <u>Abbott</u>, 348 F.3d at 542.  "If the defendant meets this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action."  <u>Id</u>.

### 1.  *January 2009 Associate Consultation Notices*

Plaintiff claims that Manna retaliated against her for Plaintiff's complaints to Hillis about Manna's alleged racial comments and that retaliation took the form of the Consultation Notices in January 2009.  However, Plaintiff's claim fails at the prima facie stage because Hillis testified that Plaintiff never complained to her about racial comments by Manna, and Manna testified that she was unaware of any complaints by Plaintiff when she wrote the Consultation Notices.  While Plaintiff alleges that she did in fact complain to Hillis starting in November of 2008, she has not produced any evidence from which a factfinder could conclude that Hillis told Manna, the decisionmaker,

16

about those complaints.[4]  "The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation."  Frazier v. USF Holland, Inc., 250 Fed. Appx. 142, 148 (6th Cir. 2007)(citing, Mulhall v. Ashcroft, 287 F.3d 543, 551 (6th Cir.2002)).

Even if it could be shown that both Manna and Hillis were not candid in their depositions regarding whether Plaintiff complained about racial slurs or whether Manna knew of such complaints, Plaintiff's claim in relation to the January 2009 Consultation Notices fails because Defendant has articulated a legitimate non-discriminatory reason for its actions – customer and co-worker's complaints – which Plaintiff has not shown to be pretextual.

In an effort to show pretext, Plaintiff alleges that Manna "made up" the complaints, that the customers who allegedly complained did not even exist, that Plaintiff was never given verbal warnings about the alleged complaints, and that Manna and Hillis "papered" Plaintiff's file with bogus complaints.  The problem with this is there is no evidence to support these allegations, but instead they are the product of Plaintiff's own beliefs, speculation and conjecture.  However, "[u]nsupported speculation cannot overcome a motion for summary judgment" Parsons v. FedEx Corp., 2010 WL 26473 at *5 (6th Cir. 2010), nor can an employee merely assert that charges are "trumped up" to establish pretext.  Simpson v. Vanderbilt Univ., 2009 WL 4981684 at *7 (6th Cir. 2009).  Instead, "'[t]o avoid summary judgment, the plaintiff is required to produce evidence that the employer's proffered reasons were factually untrue.'" Lindsay v. Yates, 578 F.3d 407, 421 (6th Cir. 2009).

---

[4]The Court notes that in the second Consultation Notice dated January 14, 2009, Manna indicated that Plaintiff refused to sign the document and told Manna that she (Plaintiff) had contacted the EEOC.  Importantly, this was *after* Hillis had instructed Manna to prepare a Letter of Going Forward which would detail in writing any complaints Manna might have with Plaintiff and *after* the most recent customer complaint which resulted in the second Consultation Notice.

17

Moreover, "[i]n order to prevail on a claim of retaliation where the defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation." Inwalle v. Reliance Medical Prod., Inc., 515 F.3d 531, 544 (6th Cir. 2008). "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." Chen v. Dow Chem. Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009).

Here, Plaintiff has not produced any evidence from which the factfinder could reasonably conclude that Defendant's explanation for Plaintiff's receipt of the Consultation Notices was false. Manna wrote up the facts underlying the October 2008 customer complaint on October 28, 2008, and for Plaintiff to show that was bogus, she would have to show that Manna made up the detailed complaint months after the event. Plaintiff offers nothing which would come close to showing such deviousness by Manna. Moreover, Plaintiff conceded in her deposition that it was "very possible" that a customer may have complained about her to Manna. (Pf. Depo. at 216-217). As for the co-worker complaints by England and Reynolds, Plaintiff concedes that she spoke with Manna about the same. While Plaintiff claims that Manna told her England's complaint was "no big deal," and that she should not take Reynold's complaint seriously, what Plaintiff has not shown is that those incidents were not a proper basis for the Consultation Notices, or that the real reason she received such notices was because Defendant retaliated against her.

When the record is considered in its entirety and the facts are construed in Plaintiff's favor, all Plaintiff has shown in regard to her receipt of the January 2009 Associate Consultation Notices is some temporal proximity between receipt of those notices and her alleged complaint to Hillis in

18

November 2008.  However, "'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.'" <u>Arendale v. City of Memphis</u>, 519 F.3d 587, 606 (6th Cir. 2008).

**2.** ***Demotion Due to Absenteeism***

Plaintiff claims that her demotion on March 13, 2009 from First Assistant Manager to associate was in retaliation for her complaining about Manna's alleged comments.  Because Defendant has set forth a legitimate, non-discriminatory reason for its action – Plaintiff violated the attendance policy by missing three days of work during a one month period – the burden shifts to Plaintiff to show that this stated reason was pretextual.

Plaintiff cannot show that Defendant's reason had no basis in fact since she admits that she was absent on the dates in question.  In this regard, the Court rejects Plaintiff's assertion that she did not violate the policy because she was absent in both January *and* February and thus her absences were not limited to one calendar month, e.g. January *or* February.  The evidence presented shows that the reference in the policy to a one month period was interpreted by Defendant to mean a thirty-day period and deference must be given to Defendant's interpretation of its own policy, particularly where that interpretation has not been shown to be "objectively wrong or inconsistent with its prior practice." <u>Sybrandt v. Home Depot</u>, 460 F.3d 560, 561 (6th Cir. 2009).

Nor can Plaintiff show that her absenteeism was not the actual reason for her demotion or that her absenteeism was insufficient to explain the Defendant's actions.  Defendant's "Attendance/Tardiness" policy defines "excessive absence" and tardiness as "[u]sually two or more 'occurrences of absence for any reason (except approved PTO, floating holiday, funeral, jury duty or a Leave of Absence authorized by the Benefits Department) within one month[.]" (Warsinsky

19

Depo. Ex. 3 at 2). The policy also provides that tardiness includes "late start times, long lunches, and early departures." (Id.). The policy further provides that an "'excessive absence' is a violation of company policy and will result in disciplinary action, which could include termination." (Id.). Plaintiff was absent for two or more days within a one month period and hence she was subject to discipline.

In her response to Defendant's Motion for Summary Judgment, Plaintiff argues that the demotion was excessive, but provides no evidence to support that contention. She identifies no one who was similarly situated yet received a lesser penalty for excessive absenteeism. See, Barrett v. Whirlpool Corp., 556 F.3d 502, 517 (6th Cir. 2009)(in considering retaliation claim, "courts may consider whether the employer treated the plaintiff differently from similarly situated individuals"). Plaintiff's own opinion about the appropriate penalty to be imposed is insufficient to survive summary judgment and "it is inappropriate for the judiciary to substitute its judgment for that of management." Smith v. Leggett Wire Co., 220 F.3d 752, 763 (6th Cir. 2000).

### 3. *Suspension and Termination*

Finally, Plaintiff claims her suspension and ultimate termination were in retaliation for her complaining to Hillis about the comments allegedly made by Manna. While Plaintiff recognizes that Warsinsky and Brummer were the ultimate decisionmakers, and while Plaintiff does not allege that either of those individuals harbored a bias against her, she asserts that Manna and Hillis intentionally misled Warsinsky and that their deception and manipulation led to the decision to suspend and terminate Plaintiff from employment.

Effectively, Plaintiff is seeking to hold Defendant liable under a "cat's paw theory" which occurs where a biased individual influences the unbiased decisionmaker to make an adverse

employment decision.  See, Cobbins v. Tennessee Dept. of Transp., 566 F.3d 582, 586 (6th Cir. 2009).  "However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." Roberts v. Principi, 283 Fed. Appx. 435, 333 (6th Cir. 2008).  This is because, "[b]y making the decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate."  Id.

In this case, Warsinsky conducted his own independent investigation into the March 18, 2009 incident between Plaintiff and Christian.  Based on this investigation, he concluded that Plaintiff had engaged in unprofessional conduct.  While Plaintiff believes it was unfair that she was suspended and not Christian, at the time the decision was made, Warsinsky had before him Christian's version of events, not Plaintiff's, and he decided that it was best not to have the two working together while the investigation proceeded.  More importantly, it is undisputed that at the time the decision to suspend was made, Warsinsky was not aware that Plaintiff had allegedly complained to Hillis about Manna's alleged comments and thus he could not have retaliated against Plaintiff on that basis.

The first time that Warsinsky became aware of Plaintiff's alleged complaints to Hillis was after Plaintiff's suspension when Plaintiff sent him her March 25, 2009 email.  Upon receipt of that information, Warsinsky contacted Hillis who denied the accusations, and he also asked Plaintiff repeatedly for further information about her alleged complaints, but Plaintiff did not respond.  "Where the employer's decisionmaker tries to get all sides of the story, the employer will not be held liable solely because one side might harbor a hidden bias against the plaintiff employee."  Roberts, 283 Fed. Appx. at 334; see, EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 488 (10th Cir. 2006)("simply asking an employee for his version of events may defeat the inference that an

21

employment decision.  See, Cobbins v. Tennessee Dept. of Transp., 566 F.3d 582, 586 (6th Cir. 2009).  "However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." Roberts v. Principi, 283 Fed. Appx. 435, 333 (6th Cir. 2008).  This is because, "[b]y making the decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate."  Id.

In this case, Warsinsky conducted his own independent investigation into the March 18, 2009 incident between Plaintiff and Christian.  Based on this investigation, he concluded that Plaintiff had engaged in unprofessional conduct.  While Plaintiff believes it was unfair that she was suspended and not Christian, at the time the decision was made, Warsinsky had before him Christian's version of events, not Plaintiff's, and he decided that it was best not to have the two working together while the investigation proceeded.  More importantly, it is undisputed that at the time the decision to suspend was made, Warsinsky was not aware that Plaintiff had allegedly complained to Hillis about Manna's alleged comments and thus he could not have retaliated against Plaintiff on that basis.

The first time that Warsinsky became aware of Plaintiff's alleged complaints to Hillis was after Plaintiff's suspension when Plaintiff sent him her March 25, 2009 email.  Upon receipt of that information, Warsinsky contacted Hillis who denied the accusations, and he also asked Plaintiff repeatedly for further information about her alleged complaints, but Plaintiff did not respond.  "Where the employer's decisionmaker tries to get all sides of the story, the employer will not be held liable solely because one side might harbor a hidden bias against the plaintiff employee."  Roberts, 283 Fed. Appx. at 334; see, EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 488 (10th Cir. 2006)("simply asking an employee for his version of events may defeat the inference that an

21

employment decision was racially discriminatory").  Given the facts presented, the Court finds that Defendant, through Warsinsky, broke any chain of causation between Manna's alleged harassing conduct and Plaintiff's suspension and ultimate termination, see, Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1236, 1250 (6th Cir. 1998), and therefore, Plaintiff has failed to submit a triable issue on whether her suspension and termination were the result of retaliation.

## IV.  CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be granted in part and denied in part.  The Motion will be granted with respect to Plaintiff's claims of retaliation, but denied with respect to Plaintiff's hostile work environment claims.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE